483 So.2d 578 (1986)
STATE of Louisiana
v.
Thomas L. WARD.
No. 85-KA-0933.
Supreme Court of Louisiana.
January 23, 1986.
Rehearings Denied March 7, 1986.
*580 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Michael McMahon, E. Sue Berni, Asst. Dist. Attys., for plaintiff-appellee.
John Lawrence, Numa Bertel, Dwight Doskey, Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
DIXON, Chief Justice.
The defendant, Thomas L. Ward, was indicted by the Orleans Parish Grand Jury with R.S. 14:30, first degree murder. At trial on August 14 and 15, 1984 the jury found the defendant guilty as charged, after finding that the state had proved one of the statutory aggravating elements, namely, that the offender had the specific intent to kill or inflict great bodily harm upon more than one person. A hearing was then held to determine the defendant's sentence. The jury found that the defendant had a significant prior history of criminal activity and had knowingly created the risk of death or great bodily harm to more than one person, and, accordingly, recommended the defendant be sentenced to death. In *581 twenty-one regular assignments of error and five supplemental assignments, defendant appeals. Finding no merit in defendant's arguments, we affirm the conviction and sentence.
On the night of June 22, 1983, Thomas Ward claims to have arrived in New Orleans from California by bus. He took a taxi to 926 Hagin Street. The house belonged to Lydia and John Spencer, the mother and stepfather of the defendant's wife. Ward's wife and children were also staying at the house. Ward was allowed into the house to visit his children. He asked and was allowed to bathe and freshen up. Ward testified that in a later conversation he learned that his wife had begun receiving welfare and the family was having some trouble with one of the daughters. The defendant claims this upset him, but rather than saying or doing anything rash, he left the house.
Ward testified that he then went to a local bar where he drank vodka and beer and "hit up" with cocaine. He then went back to the Hagin Street house, at approximately 5:30 a.m., asking to see his children one last time. After visiting with the children he gave his wife his address and phone number in New York, then went into the bedroom of his wife's mother and stepfather. He pulled out a gun, pointed at the victim, John Spencer, and said, "I am sorry, John, I have to kill you." He then fatally shot the victim once at close range. As Lydia Spencer reached for her husband, the defendant shot her in the stomach. When she turned around, he shot her in the back. Lydia Spencer ran for the door, trying to get out of the house. The defendant followed her, striking her with three more shots. Linda Ward and her brother, Ernest Scott, heard the shooting and ran from the house to get help from the neighbors.
The defendant testified in the penalty phase to only remembering being in the house, then being on the street corner, surrounded by police officers. He said he took more cocaine at the time, fearing the police would catch him with it. Ward walked up to the police officers, ostensibly to turn himself in. The police did not at first seize Ward, not yet knowing he was the alleged murderer. Ward claims the police shooed him away because he was drunk. After further investigation at the scene the police realized who Ward was and arrested him.

GUILT PHASE
Assignments of Error Nos. 1, 5 and 6; Supplemental Assignments Nos. 1 and 2
By these assignments of error the defendant makes various claims against the constitutionality of Louisiana's capital sentencing scheme. The issues raised in these several assignments tend to overlap, and hence will be considered together.
The defendant first contends that the evidence was insufficient to try him for first degree murder and, because of this classification, he was illegally subjected to a "death qualified" jury. This issue has been encountered before. In State v. Welcome, 458 So.2d 1235, 1245 (La.1983), cert. den. ___ U.S. ___, 105 S.Ct. 1856, 85 L.Ed.2d 152 (1985), we stated:
"... one of two factors must be present to satisfy the requirements for the aggravating circumstance: Either a single act of homicide by an offender must create a genuine risk of death or great bodily injury to more than one person, such as the risk created by the explosion of a bomb in a crowded building; or, a single consecutive course of conduct by the offender must contemplate and actually cause the death of one person and the death or great bodily harm of another..."
In State v. Williams, 480 So.2d 721 (La. 1985), the defendant complained that the evidence against him was not sufficient to support the aggravating element in R.S. 14:30(3) and the aggravating circumstance in C.Cr.P. 905.4(d). After a detailed survey of the jurisprudence, the court concluded that the statutes should be given a parallel construction because both validly help the jury distinguish between those murderers who should be handed the death sentence *582 or those who should receive life imprisonment.
In State v. Williams, supra, the defendant entered a bar in a hostile mood. When a patron asked to take the defendant's picture, in a good will gesture, the defendant said, "That'll be the last picture you shoot." The defendant then shot and killed the patron. He then turned his gun on the other patrons and the owner of the bar, striking the owner in the arm. The court concluded the evidence presented clearly supported a conclusion that the defendant specifically intended to cause the death of one person and the risk of great bodily harm to another by a series of acts in a single course of conduct.
In State v. Welcome, supra, the defendant argued with his aunt and her friend. He shot the friend, then chased his aunt down a street before finally fatally wounding her. The conviction and sentence were upheld.
The facts of this case are similar to Williams and even stronger than Welcome. The defendant walked up to the victim and said, "I am sorry, John, I have to kill you." Immediately thereafter, as the victim's wife threw herself on her husband, the defendant fired five shots at the woman. These facts clearly support a conclusion that the defendant contemplated and caused the death of one person and great bodily harm to another by a single, consecutive course of conduct.
The defendant also contends the state should have made a prima facie showing of the existence of an aggravating element in a pretrial hearing. In State v. Stewart, 458 So.2d 1289 (La.1984), we noted that such pretrial rulings are not provided for in our rules of procedure, and that there is no merit in this contention. Id., unpublished appendix, p. 1.
Next, the defendant argues that C.Cr.P. 798(2)[1] violates his Sixth Amendment rights to a fair trial and his due process rights. The defendant claims the use of this article to exclude jurors opposed to the death penalty prevented him from having a fair cross section of jurors because by eliminating jurors who insist they cannot vote for the death penalty, there results a "death qualified" jury that is biased in favor of the state on the issue of guilt and death as a penalty for first degree murder.
The language of C.Cr.P. 798(2) closely tracks language in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which acknowledged that the state was limited in its reasons for excluding prospective jurors but admitted that it would probably be proper to exclude a juror if he made it clear that he would automatically vote not to impose the death penalty. The Witherspoon decision was grounded in the states' legitimate interest in administering their capital sentencing procedures by having impartial jurors who will adhere to their oaths.
The United States Supreme Court recently clarified its Witherspoon holding and stated that the correct standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the prospective juror's views would:
"`... prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' ... this standard likewise does not require that a juror's bias be proved with `unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner *583 of a catechism...." Wainwright v. Witt, ___ U.S. ___, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).[2]
Further, this court has repeatedly upheld the application of C.Cr.P. 798(2). State v. Lowenfield, (La.1985) (No. 85-KA-0255); State v. Celestine, 443 So.2d 1091, 1093-94 (La.1983), cert. den. ___ U.S. ___, 105 S.Ct. 224, 83 L.Ed.2d 154 (1984).
A review of the record convinces us that the standards of 798(2) and Witt were complied with and only those prospective jurors who clearly indicated they could never vote for the death penalty were excluded. The prosecutor explained in detail what the jurors would be called on to do. Those who then indicated a hesitancy about the death penalty were further questioned. The prosecutor generally asked if the prospective juror's concerns were moral or religious, and whether these were longstanding beliefs. Although successive questioning of each juror may have diminished somewhat, all prospective jurors clearly had to admit there was no circumstance in which they could envision themselves voting for a death sentence. Also, the judge generally questioned each prospective juror. We have no reason, therefore, to presume the trial judge improperly exercised his discretion in dismissing these jurors. Under Witt, it is clear that considerable discretion must be afforded the trial judge in these matters. 105 S.Ct. at 853-55.
In his first two supplemental assignments of error, the defendant specifically challenges the granting of challenges for cause for two jurors. One juror, Marie Jamerson, thought she could not be fair to either side because a nephew who was very close to her had been murdered. Another juror, Darla N. Cibulski, thought she might have taught a child with the same last name, and if this were the defendant's son, that she might have trouble being completely open-minded about her decision.
It does not appear then that these jurors were excused because of their opinions on the death penalty. Rather, these challenges were for cause based on C.Cr.P. 797(2). Both jurors were questioned extensively by the prosecutor and they clearly indicated their difficulty in returning a fair verdict. We cannot say it was an abuse of the trial judge's broad discretion in excusing these jurors for cause.
All of these assignments, therefore, are without merit.
Assignment of Error No. 3
In his application for a bill of particulars the defendant requested production of statements of witnesses favorable to him and an in camera inspection of the grand jury testimony of the state's witnesses. In this assignment the defendant contends the state's refusal to provide the information was error.
It is not contested that there were no written statements by the state's witnesses that were favorable to the defendant. Rather, the defendant claims the statements made by the witnesses to the police after the shooting should be disclosed. Defendant correctly relies on State v. Shropshire, 471 So.2d 707 (La.1985) for the proposition that initial police reports are public records.
However, Shropshire does not apply to this case. The amendment to the public records law that was the basis of Shropshire became effective on September 3, 1984. The trial in this case was on August 14 and 15, 1984. The Shropshire decision itself recognized that prior to the amendment police reports were confidential and not subject to disclosure. State v. Shropshire, supra at 709.
The defendant also sought an in camera inspection of the grand jury testimony *584 of the state's witnesses. Under C.Cr.P. 434(A), the proceedings of a grand jury generally must be kept secret. Two exceptions listed in the article are when there are statutory irregularities in the proceedings or when a witness commits perjury before the grand jury. State v. Ates, 418 So.2d 1326, 1329 (La.1982). The defendant did not show that these exceptions should apply, or any other compelling reason why the testimony should be disclosed. This assignment, therefore, is without merit.
Assignment of Error No. 7
With this assignment the defendant contends the trial court erred in not granting one of his challenges for cause. Counsel for the defendant asked whether any of the prospective jurors or their acquaintances had ever been subjected to criminal activity. Juror Diane C. Genre responded that her in-laws had been mugged and robbed, and a close friend had been shot in an attempted armed robbery. Defense counsel challenged this juror for cause, and this request was denied.
However, C.Cr.P. 800 instructs that a defendant may not assign as error the failure to sustain a challenge for cause unless he first objected to the ruling at trial. The record does not indicate that the defendant did so. Furthermore, it is noted that although the prospective juror admitted that she might be affected by the crimes, she nonetheless stated that, "I think that I can give a fair and impartial trial." She also stated that she would "have to say yes" that she could return an impartial verdict. The trial judge is vested with broad discretion in ruling on a challenge for cause, and such a ruling will not be disturbed unless when reviewing the entire voir dire as a whole there is an indication that there was an abuse of discretion. State v. Jones, 474 So.2d 919, 926 (La.1985). We cannot say that there was an abuse of the trial judge's broad discretion. This assignment is without merit.
Assignment of Error No. 8
During the voir dire the prosecutor referred to the crime as "the murder." Defense counsel objected to this reference, but was overruled. The judge believed the reference was "merely a name for what the defendant is charged with, sir." The defendant assigns error to this denial, claiming it violated his constitutional presumption of innocence and created a foregone conclusion that the pretrial label for the homicide was murder.
The injury claimed by the defendant is vague, and the trial judge's conclusion is not incorrect. Further, it was made clear to the jury that the defendant was only accused of first degree murder. In any event, we cannot say that this "error" reasonably might have contributed to the conviction, State v. Gibson, 391 So.2d 421, 427 (La.1980), and any error is therefore harmless. This assignment lacks merit.
Assignment of Error No. 9
The defendant contends in this assignment that the trial judge erred in sustaining the prosecutor's objection to a question as hearsay. In attempting to prove the defendant's intoxication defense, defense counsel asked one of the arresting officers: "Did he [another witness] indicate to you in any way that theMr. Wardhad tried to give himself up?" The prosecutor objected, insisting the question was "a round about way of getting in hearsay."
"`Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.'" State v. Trahan, 475 So.2d 1060, 1063 (La.1985) (citing State v. Martin, 356 So.2d 1370 (La.1978)). The question clearly required the officer to respond with a statement the other witness made out of court, and which depended for its veracity upon the credibility of the witness. The importance of the question is the matter asserted therein, that is, evidence *585 that would indicate intoxication, and not the fact the question was asked.
The defendant has not alleged any exception to the hearsay rule that would allow him to admit the question. Instead, he urges that the ruling violated his right of cross-examination. This contention clearly has no merit. Both the witness in question and the officer who actually first approached the defendant were called to testify, and the defendant questioned these witnesses. This assignment is without merit.
Assignment of Error No. 10
In this assignment the defendant contends the court erred in not holding a hearing as to whether Linda Ward, the defendant's wife, was aware of her privilege not to testify against her husband. Defense counsel requested a bench conference after the state called Linda Ward to the stand. The jury and the witness were removed from the courtroom. Counsel then requested the court to hold a hearing to consider whether Linda was aware of her privilege not to testify. The court declined, under the persistent belief that there was no authority for such action. Defendant's claim is based on R.S. 15:461(2), which provides: "Neither husband nor wife shall be compelled to be a witness on any trial upon an indictment, complaint or other criminal proceeding, against the other."
In State v. Bennett, 357 So.2d 1136, 1139-40 (La.1978), this court held that the "... exercise of this privilege rests with the testifying spouse alone and may not be invoked by the defendant-spouse. The statute, however, does not prohibit a spouse from waiving this privilege and voluntarily taking the stand against the other spouse to testify to nonprivileged evidence...." Clearly, then, the defendant could not have prevented the wife from testifying. The only question is whether the court had a duty to inform the witness of her privilege or to determine whether she knew of her privilege, and, if so, did the failure to inform her give rise to error.
Nowhere in our rules of procedure or jurisprudence is such a duty stated. In fact, this is generally true for all privileges except that against self-incrimination. All that appears necessary, as indicated by the Bennett court, is a voluntary waiver of the privilege.[3] It would require some imagination to believe Linda Ward did not testify voluntarily. The defendant was on trial for killing her stepfather. The defendant had sexually abused Linda Ward and her children. She testified that she believed the defendant should be electrocuted because he "messed up a lot of lives," in particular, that of their daughter. Finally, the prosecutor stated as an officer of the court that Mrs. Ward was not being compelled to testify. This assignment is without merit.
Assignment of Error No. 11
With this assignment the defendant contends the trial judge erred in allowing into evidence State's Exhibit No. 24, the medical records from Charity Hospital in New Orleans of Lydia Spencer. The records were admitted after Lydia Spencer testified and was cross-examined by the defendant. During the testimony, she recounted being shot five times and going to the hospital. The defense objected to the admission of the evidence, based on the lack of authenticity. The defendant now contends the admission of the records deprived him of a fair trial because he was not afforded the right of cross-examination.
The prosecution relied on R.S. 13:3715,[4] which provides for the admission of certified *586 copies of records from state institutions. This court noted in State v. Trahan, 332 So.2d 218, 219-20 (La.1976) that "... when the statutory requirements have been satisfied, introduction of certified copies of hospital records does not deny a defendant the right to confront witnesses against him...."
The medical records were not made a part of the record; the defense objected on the basis of authenticity, and the trial judge had before him the statute. It is logical to conclude the trial judge was satisfied as to the records' compliance with the statute.
Assignment of Error No. 12
With this assignment the defendant contends it was error for the court to introduce State's Exhibit No. 10, a close-up photograph of the victim's upper body. Because the state had already admitted Exhibit No. 8, another photograph showing more of the victim's body, the defendant contends the photograph had no probative value and was only introduced to inflame the jury and prejudice the defendant.
State v. Watson, 449 So.2d 1321, 1326 (La.1984), cert. den. ___ U.S. ___, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985), sets out the standard for admission of such evidence:
"Post-mortem photographs of a murder victim are admissible to prove corpus delicti, to corroborate other evidence establishing the cause of death, and to provide positive identification.... The admission of gruesome photographs will not be overturned unless it is clear that their prejudicial effect outweighs their probative value...."
The first photograph shows the victim sprawled on the floor, with a wound on the arm; the second shows more detail of the scratch where the bullet entered and some blood oozing from the victim's mouth. Neither photograph is particularly gruesome compared with other photographs previously held admissible. See State v. Boyer, 406 So.2d 143, 148 (La.1981). The photographs are not so gruesome as to "overwhelm reason" and associate the defendant with the crime without sufficient evidence. State v. Watson, supra at 1326. This assignment is without merit.
Assignment of Error No. 13
In this assignment the defendant contends the court erred by giving the jury the following instruction at the close of the guilt phase: "Where there are no external signs of intent other than the mere fact of the homicide, a specific intent to kill may be inferred from the facts and circumstances of the case." The defendant contends this charge shifted the burden of proof to him from the state, violating his due process rights and depriving him of his overriding presumption of innocence as provided by Sandstrom v. Montana, ___ U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).
Recently, in Francis v. Franklin, ___ U.S. ___, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), the United States Supreme Court noted that the proper inquiry for determining whether a specific charge violated the due process rights of the defendant is whether the language created a mandatory presumption, one that instructs the jury it must infer the presumed fact if the state proves the predicate facts, or a permissive inference, which suggests to the jury a possible conclusion if the state proves the predicate facts. Id. at 1971. A mandatory presumption violates due process if it operates to relieve the state of a burden of proof of any element of the crime; a permissive inference violates due process only if it is unreasonable in light of the facts. Id.
Applying these guidelines, it is clear the charge involved in this case was a reasonable, permissive inference. It provided only that specific intent to kill may be inferred from the facts; it is not couched in the mandatory terms of either Sandstrom or Francis. In fact, it is a paraphrase of *587 R.S. 15:445, which provides that "intent ... need not be proven as a fact, it may be inferred from the circumstances of the transaction."
It cannot be said that this jury charge violated the defendant's due process rights; therefore this assignment lacks merit.
Assignments of Error Nos. 2 and 4
Assignments Nos. 2 and 4 were neither argued nor briefed and were specifically abandoned. However, in any case where the death sentence is imposed, this court reviews all assignments of error as a matter of policy. State v. Narcisse, 426 So.2d 118, 131 (La.1983), cert. den. 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176, rehearing den. 464 U.S. 1004, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983).
Assignment No. 2 claimed error in the trial judge's denial of a motion to suppress the evidence seized from the defendant's automobile. The state responded that no such evidence was seized and the defendant so concedes. There is no merit to this assignment.
Assignment No. 4 claimed error in the trial judge not granting paragraph 14 of the defendant's prayer for oyer. There is no paragraph 14 and this assignment therefore lacks merit.

PENALTY PHASE
Assignments of Error Nos. 14, 15, 16 and 17; Supplemental Assignments Nos. 3 and 4
Through various assignments of error, defendant contests the admission of evidence of unrelated prior crimes and misconduct. The defendant first complains that it was error to allow the state to introduce the same evidence in the penalty stage that it was allowed to introduce in the guilt phase. This argument is without merit. Previously this court has held that C.Cr.P. 905.2 explicitly provides that in the sentencing phase the "jury may consider any evidence offered at the trial on the issue of guilt." State v. Rault, 445 So.2d 1203, 1216 (La.1984), cert. den. ___ U.S. ___, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984).
Next, defendant argues that the admission of the evidence of past misconduct was error because the state injected arbitrary elements into the proceeding. The first inquiry is whether there was adequate prior notice to the defendant of the intention to use evidence of past misconduct. In a recent case, State v. Hamilton, 478 So.2d 123, 132 (La.1985), this court noted that "fundamental fairness dictates that an accused receive adequate prior notice that evidence of unrelated criminal activity may be offered by the prosecutor in an effort to punish him for the charged crime." In so holding, this court held that C.Cr.P. 720, which requires the prosecutor to provide notice of his intent to use other crimes evidence in the guilt phase if the defendant so moves, is applicable to the penalty phase.
In his prayer for oyer, the defendant made a general request for any documents discoverable under C.Cr.P. 716-22. Without explicitly denying the intention to use a document related to C.Cr.P. 720, the prosecutor failed to notify the defendant of any record of past criminal activity. However, in his application for a bill of particulars, the defendant asked which statutory aggravating circumstances would the prosecutor rely on in seeking the death penalty. The prosecutor replied: "Defendant's prior criminal record (905.4(c); 905.4(d); 905.4(g)."
Therefore, it is evident that the defendant knew the prosecution would introduce evidence of his prior criminal activity. Considering that the majority of the crimes were sex crimes involving the defendant's family, it is logical to conclude the defendant was not surprised by the introduction of the evidence. This conclusion is buttressed by defense counsel's attempt, during his opening statement of the penalty phase, before the crimes had been introduced, to explain defendant's crimes as being "crimes that involve psychological problems, a sexual problem, and they were not what we would call violent history of criminal acts." As we noted in State v. *588 Rault, supra at 1215, the defendant "does not contend his strategy would have been different had he been aware of the allegedly nondisclosed evidence."
In determining that the defendant had adequate notice of the prosecutor's intention of bringing up defendant's past misconduct, we note that the notice required in the penalty phase is not as detailed as that required by C.Cr.P. 720 in the guilt phase and State v. Prieur, 277 So.2d 126 (La.1973), because in the penalty phase there has already been a determination of guilt lessening the chance that the defendant will be tried for crimes other than those charged.
In conformity with C.Cr.P. 905.3 the state attempted to prove three of the "aggravating circumstances" listed in C.Cr.P. 905.4 in order to show that the defendant deserved the death penalty. The jury found two aggravating circumstances, that the defendant had a prior history of criminal activity, and that the defendant knowingly created a risk of death or great bodily harm to more than one person. The first aggravating circumstance found, C.Cr.P. 905.4(c), that the defendant had a prior history of criminal activity, has been declared unconstitutional. State v. David, 468 So.2d 1126 (La.1985).
It is settled that a death sentence need not be reversed if the existence of one of at least two alleged aggravating circumstances is not upheld, as long as the evidence supports the remaining circumstance, and the consideration of the unproven circumstance did not introduce an arbitrary factor into the proceeding. State v. Sawyer, 422 So.2d 95, 101 (La.1982), cert. den. 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984).
Such is the case here. First, the jury, as part of its finding of first degree murder in the guilt stage, determined that the defendant intended to inflict great bodily harm or death upon more than one person. A death sentence could be imposed upon this finding. Second, for the following reasons, consideration of the defendant's prior criminal conduct, irrespective of the intention for which it was introduced, did not inject an arbitrary factor into the proceeding.
Although the evidence arguably should not have been introduced in order to prove the aggravating circumstance, it was permissible in order to show the defendant's character. The evidence included Exhibit No. 25, which indicated that the defendant was charged in New York state with two counts of burglary and pleaded guilty to attempted burglary. Exhibit No. 26 showed that he was charged with and pleaded guilty to misdemeanor rape, also in New York. According to Exhibit No. 27, the defendant pleaded guilty in New York to third degree assault. Exhibit No. 28 is an indictment from California charging the defendant with four counts of sexual misconduct with the minor daughters of Lydia Spencer. The defendant pleaded guilty to unlawful sexual intercourse with Linda Scott, and the other charges were dismissed. Exhibit No. 29 was another California indictment charging the defendant with sex crimes including forcible rape, unlawful sexual intercourse with a minor, incest and oral copulation. The defendant pleaded guilty to a charge of cruelty to a juvenile (his daughter Tasha) and all other charges were dropped.
Additionally, at the trial, Linda Ward and Lorraine Scott, children of Lydia Spencer, testified to various sexual encounters with the defendant and to witnessing encounters with other of their sisters. Linda also testified to beatings by the defendant with his fists and belt buckles. Ernest Scott, the brother of Linda and Lorraine, also testified he witnessed a sexual encounter between the defendant and his sister Lorraine, and that the defendant had once violently beaten him.
The jury therefore heard evidence of the defendant's convictions, or crimes he was charged with but not convicted of, and, through the testimony of the witnesses, crimes not specifically linked to those documented.
This court has accepted evidence of other offenses as relevant, competent evidence of the defendant's character in the penalty *589 phase of trial. In State v. Jordan, 440 So.2d 716 (La.1983), it was held correct for the judge to allow the prosecution to anticipatorily introduce evidence of the defendant's prior convictions. This was because C.Cr.P. 905.2 provides that the sentencing phase "... shall focus on the circumstances of the offense and the character and propensities of the offender...." (Emphasis added). That statute further provides that evidence relative to aggravating or mitigating circumstances is relevant, even if the defendant does not place his character in issue.
Later, in State v. Sawyer, supra, evidence pertaining to an indictment for second degree murder was held admissible even though the defendant was eventually charged only with manslaughter. This holding was premised on the fact that the defendant later testified concerning the incident and that "the gravamen of the evidence was a presentation of the facts of the occurrence.... Id. at 104.
Finally, in State v. Lowenfield, supra, this court stated that: "Evidence of an unrelated crime for which defendant has not been convicted is highly relevant as to a convicted killer's character and propensities and is arguably admissible." Lowenfield set the outer limit of admissibility by instructing that the evidence must be competent and sufficient to convince the trier of fact that the defendant did in fact commit the other crime. Id. at 24. In Lowenfield a bare bill of information, standing alone without other corroborating evidence, was held not sufficient to be admissible.
Clearly, the evidence pertaining to the defendant's convictions was admissible. All were based on pleas of guilty, supported by certified documents introduced which indicated plea bargains in which some counts were dropped in return for lenient sentences. The sex crimes which were dropped were either those described by defendant's children and wife, or, if not identical, offenses of the same nature with the same victims. Neither the state nor defendant made any effort to correlate with or distinguish the crimes charged in the certified documents from those described in testimony by the witnesses. The evidence was that of an entire family either physically or sexually abused by the defendant, who frankly admitted he never went anywhere without his gun and a reserve dose of drugs.
There was no surprise, no undue prejudice and no arbitrary factor injected into the deliberations of the jury.
Assignment of Error No. 18
With this assignment the defendant contends the trial judge erred by not allowing the jury to view Defense Exhibits Nos. 1 and 2 after they were admitted into evidence. These documents were a 1980 psychological profile from California and a 1965 order from the New York Family Court. The court refused to allow the jury to view the documents and instead ordered them read to the jury.
Under C.Cr.P. 17 the trial judge has considerable discretion in the proceeding of the trial. State v. Kirkpatrick, 443 So.2d 546, 557 (La.1983), cert. den. 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984). It is further within the judge's discretion to allow jurors to view any evidence where a physical examination is required for the jury to reach a verdict. C.Cr.P. 793. It was not an abuse of the judge's wide discretion in deciding that the documents should be read to the jury and not provided to them for physical viewing. State v. Passman, 345 So.2d 874, 885-86 (La.1977). Such treatment was consistent with that accorded the prosecution's evidence; further, the judge stated he would let jurors read the documents if they wished. This assignment lacks merit.
Assignment of Error No. 19; Supplemental Assignment No. 5
By these assignments defendant complains that the judge erred by refusing to give a requested jury instruction that if the jurors failed to reach a unanimous verdict, a life sentence would be imposed automatically by the court. Considering this issue in State v. Williams, 392 So.2d 619, 633 (La.1980), we stated that in "... giving *590 jury instructions during the penalty stage of the trial, the trial judge [is] obliged to inform the jurors fully as to the consequences of their penalty recommendation..."
In that case the jury returned to the courtroom approximately three hours after they had been charged and asked if their recommendation had to be unanimous. The judge told them yes. Because the jurors were not adequately informed of the consequences of their actions, reversible error was found. This situation occurred again in State v. Loyd, 459 So.2d 498 (La. 1984), where, after an hour of deliberation, the jury questioned the need for unanimity. The judge again believed he had to tell the jury the verdict had to be unanimous, and this was again held reversible error.
Both of these cases are distinguishable from the instant case. Here, the jury was sent to deliberate and they picked a foreman. This foreman was sent out very early in the deliberations, apparently before any considerable discussion had taken place. The following exchange with the judge took place:
"BY THE COURT:
You have got a question, Mr. Garcia?
BY JUROR # 146, Louis E. Garcia:
Yes, I did. Our question was before we even begin our deliberations we were wondering what would be the result of the case if we were unable to be unanimous after lengthy deliberation on either sentence?
BY THE COURT:
Then the defendant would be sentenced to life imprisonment.
BY JUROR # 146:
That's all, thank you.
BY THE COURT:
Alright, take them out. That's without benefit of parole, probation, or suspension of sentence."
It is clear then that the jury had knowledge of the consequences of their actions before reaching their decision. This satisfies our concern in Williams, and this assignment is without merit.
Assignment of Error No. 20
In this assignment the defendant claims it was error for the judge not to grant his motion for a new trial. His three bases for seeking a new trial were that (1) the court's charge on first degree murder and specific intent was a prohibited charge; (2) first degree murder was not proved as there was insufficient evidence that the defendant had the specific intent to kill or inflict great bodily harm on more than one person; and (3) that the trial court allowed the introduction of inadmissible evidence. All of these contentions have been considered in other assignments and found to be without merit; therefore, this assignment is also without merit.

CAPITAL SENTENCE REVIEW
Assignment of Error No. 21
In Assignment No. 21 the defendant contends the trial court erred in sentencing him to death. Furthermore, under this state's capital sentencing scheme this court will review a death sentence to determine whether it was imposed under the influence of prejudice, passion or any other arbitrary factor; whether the evidence supports an aggravating circumstance; and whether the sentence is disproportionate to other cases, considering both the crime and the defendant. C.Cr.P. 905.9 and Supreme Court Rule 28.
In other assignments of error we have already considered whether certain events during the trial prejudiced the defendant or injected other arbitrary factors into the proceeding. We find no prejudicial or arbitrary factor. Both the victim and the defendant were black, and there were blacks on the jury.
As stated before, the evidence clearly established the existence of an aggravating circumstance, namely, the infliction of death or great bodily harm upon more than one person. C.Cr.P. 905.4(d). Therefore, we need now only consider proportionality.
*591 According to the district attorney's sentencing report, juries in Orleans Parish have recommended the death penalty in eighteen cases, in addition to the instant case. In six of these cases the jury found as an aggravating circumstance that the defendant knowingly created the risk of death or great bodily harm upon more than one person.
In State v. Monroe, 397 So.2d 1258 (La. 1981), cert. den. 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411, rehearing den. 463 U.S. 1249, 104 S.Ct. 36, 77 L.Ed.2d 1455 (1983), the defendant entered the window of his next door neighbor, armed with a knife. During an ensuing struggle, the victim was fatally stabbed repeatedly and her daughter was stabbed once in the back. This court found no error in the jury's conclusion that the defendant knowingly created a risk of death or great bodily harm to more than one person, and that the murder was committed during an attempted aggravated burglary.
In State v. Mattheson, 407 So.2d 1150 (La.1982), cert. den. 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412, rehearing den. 463 U.S. 1249, 104 S.Ct. 37, 77 L.Ed.2d 1456 (1983), the defendant entered a beauty salon and immediately killed the receptionist with a shotgun blast. While robbing the approximately twenty-five patrons in the salon, the defendant shot another woman in the leg. The death sentence was upheld in this case, however, the court only reviewed the finding that the murder occurred during the commission of an armed robbery.
In two other cases, State v. Marshall, 414 So.2d 684 (La.1982), cert. den. 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982), and State v. Williams, supra, death or great bodily harm was threatened on more than one person. The juries recommended the death penalty, but the sentences were either reversed or not considered on other grounds.
Thus, in two cases, this court has upheld death sentences where more than one person was placed at risk. In particular, the facts of this case are similar to the Monroe case. In that case this court noted that "A review of first degree murder convictions in Orleans Parish reveals that juries are more apt to recommend death when more than one person is endangered than when the aggravating circumstance is armed robbery." State v. Monroe, supra at 1278.
This defendant had engaged in a course of sexual and physical abuse on at least two generations of one family. He was constantly running afoul of the law. He calmly murdered a member of that family, after the victim had allowed the defendant the opportunity to visit his family one last time before leaving town. The defendant immediately thereafter pumped five shots into the victim's wife, the mother of the defendant's wife. Considering the defendant and his crime, the sentence of death was not disproportionate.
For the above reasons, the defendant's first degree murder conviction is affirmed. The defendant was not sentenced to death as a result of passion, prejudice or other arbitrary factor; defendant's death sentence is not disproportionate to other similar cases. The sentence of death is therefore affirmed.
LEMMON, J., concurs and assigns reasons.
LEMMON, Justice, concurring.
Evidence of an unrelated crime is admissible in the penalty phase of a capital case if the defendant has been convicted of that crime. State v. Sawyer, 422 So.2d 95 (La. 1982); State v. Jordan, 440 So.2d 716 (La. 1983). However, this court has never squarely decided whether evidence is admissible as to an unrelated crime for which the defendant has not been convicted. State v. Hamilton, 478 So.2d 123 (La.1985). I am inclined to the view that such evidence is admissible if there was clear and convincing evidence of the defendant's connection with the commission of the unrelated crime, if the proffered evidence was otherwise competent and reliable, and if the unrelated crime had relevance and substantial probative value as to the defendant's *592 character and propensities, which is the focus of the sentencing hearing under La. C.Cr.P. Art. 905.2. However, the bills of information were not competent evidence and should have been excluded. Nevertheless, the trial judge's error in admitting this clearly improper evidence was harmless under the circumstances of this case.
As to Assignment No. 10, the trial judge, at least when requested to do so, should have instructed the defendant's wife, when called as a witness, that she could not be compelled to testify against her husband. However, the tenor of her testimony demonstrated that this error by the trial judge was also harmless.
NOTES
[1] C.Cr.P. 798 provides:

"It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
. . . . . .
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt; ..."
[2] We note that the Supreme Court has indicated it will reexamine the issue of excluding those jurors opposed to the death penalty. Lockhart v. McCree, ___ U.S. ___, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985). This is an appeal from a decision of the Eighth Circuit which narrowly held that "death qualified" juries violate the Sixth Amendment. Grigsby v. Mabry, 758 F.2d 226 (8th Circ. 1985).
[3] See, e.g., McCormick On Evidence, § 83, at 170 (E. Cleary 2d ed. 1971). ("A failure by the holder to assert the privilege by objection, or a voluntary revelation by the holder of the communication, or of a material part, is a waiver."); Cal.Evid.Code § 912 (West 1985).
[4] R.S. 13:3715 provides:

"Whenever a certified copy of a chart or record of any state operated health care facility is offered in evidence or when any court of competent jurisdiction has ordered the production of any chart or record of a state operated health care facility, certified copies of such chart or record, signed by the administrator or the medical records librarian of such hospital and attested by the seal of the hospital, shall be received in evidence with the same force and effect as though the original document were produced, and it shall be a sufficient compliance with any such order of court to furnish copies so certified."